## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No. 25-cr-00094-JLK

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2.  CHRISTIAN GRANAT,

      Defendant.

---

## MEMORANDUM SENTENCING OPINION

Kane, J.

On December 8, 2025, Mr. Granat entered into a plea agreement and pleaded guilty to a violation of 18 U.S.C. § 371, conspiracy to violate the laws of the United States, namely by possessing a machinegun in violation of 18 U.S.C. §§ 922(o) and 924(a)(2) and making an unregistered machinegun in violation of 26 U.S.C. § 5861(f). Mr. Granat came before me today for sentencing on this conviction.

For a violation of 18 U.S.C. § 371, the maximum term of imprisonment is five years, the maximum term of supervised release is three years, the maximum fine is $250,000, and a $100 special assessment fee is required. I may impose a term of probation of one to five years under 18 U.S.C. § 3561(c)(1). If probation is imposed, it must include at least one of the following conditions: restitution, community service, or a fine, as required by 18 U.S.C. § 3563(a)(2).

In the Presentence Report ("PSR"), the Probation Officer calculates the advisory Sentencing Guidelines range as 46 to 57 months of imprisonment followed by up to 1 to 3 years of supervised release. PSR ¶ 106, ECF No. 86. This range is based on a total offense level of 23

1

and a Criminal History Category of I. The base offense level for Mr. Granat's crime of conviction is 18. *Id.* ¶ 38. The Probation Officer increased this level by four because the offense involved between 8 and 24 firearms under U.S.S.G. § 2K2.1(b)(1)(B). *Id.* ¶ 39. The offense level was further increased by four levels pursuant to U.S.S.G. § 2K2.1(b)(4)(B)(ii) based on the Probation Officer's determination that Mr. Granat knew a firearm involved in the offense lacked a serial number. *Id.* ¶ 40. The offense level was then decreased by 3 for Mr. Granat's acceptance of responsibility, resulting in a total offense level of 23. *Id.* ¶¶ 49-51. Under the Guidelines, the fine range for an offense level of 23 is $20,000 to $200,000.

## I.  RULINGS ON OBJECTIONS TO THE PSR

Before considering the appropriate sentence in this case, I first rule on Mr. Granat's Objections to the PSR and his Motion for a Non-Guideline Sentence. Mr. Granat raises nine objections to the PSR: two objections that affect the calculation of the advisory Guidelines range; six objections that do not affect the Guidelines calculation; and one objection to the proposed special conditions of supervision. *See* Def.'s Obj. to PSR, ECF No. 71.

**Objections Affecting the Guidelines Range**

Objection to Paragraph 39 of the PSR (the Offense Level Calculation)

In the PSR, a four-level Guidelines enhancement was applied pursuant to U.S.S.G. § 2K2.1(b)(1)(B) on the ground that the offense involved between 8 and 24 firearms. PSR ¶ 39. The prosecution contends that the offense involved at least eight privately manufactured firearms ("PMFs") that qualify as "firearms" for the purposes of U.S.G.G. § 2K2.1, which uses the

definition of "firearms" in the Gun Control Act ("GCA"), 18 U.S.C. § 921(a)(3)(B). Resp. to

Def.'s Obj. to PSR at 1, ECF No. 89.

Specifically, the prosecution points to seven Glock-type firearm frames, as well as a fully

completed and functioning Glock-type 9mm pistol recovered from Mr. Granat's co-defendant,

Aiden Fritz, at the time both were taken into custody. *Id.* at 2. The Glock-type frames as well as

the functioning Glock-type 9mm pistol were allegedly manufactured by Mr. Granat using a 3D

printer.

Mr. Granat objects to the four-level enhancement under U.S.S.G. § 2K2.1(b)(1)(B),

arguing that his offense involved fewer than eight firearms and therefore, does not warrant the

enhancement. Def.'s Obj. to PSR at 2-5. Mr. Granat raises two arguments in support of his

objection. First, citing to U.S.S.G. § 2K2.1, comment n.5, he argues that the Guidelines advise to

"count only those firearms that were unlawfully sought to be obtained, unlawfully possessed, or

unlawfully distributed." *Id.* at 2-3. He contends, at the time of offense, his possession of firearms

was not unlawful, and therefore, manufacturing 3D printed frames for his personal use did not

violate federal law. *Id.*

Mr. Granat's assertion that the 3D printed frames were manufactured solely for his

personal use is contradicted by the record. The record reflects that, although certain firearm

frames had not yet been distributed, other frames had in fact been distributed to third parties.

Specifically, the PSR includes the following facts:

- *GRANAT also advised that he would print a PMF frame for the* [*Confidential Informant ("CI")*]. The CI informed GRANAT that the AR-platform [machinegun conversion devices "]MCDs["] previously purchased were too wide and GRANAT stated, "[y]ea, I shaved these ones down (referring to the MCDs he was holding)." *GRANAT agreed to print and sell* 10 AR-platform

MCDs for $400, 10 Glock-style MCDs for $200, and *2 Glock 19-style PMFs for $200* ($800 total). PSR ¶ 19 (emphasis added).[1]

- On February 19, 2025, *investigators utilized the ATF CI to conduct a controlled purchase* of MCDs and *a PMF from FRITZ* at 4304 Prestige Point. . . . Upon entering the residence, FRITZ was observed carrying a black, polymer-framed pistol, which the CI later reported appeared to be a "ghost gun" (a PMF absent of any serial numbers). *FRITZ provided the CI with a Glock-style PMF and told the CI that if it broke, GRANAT would mail the CI a new one.* FRITZ took the slide off his pistol and demonstrated how it would fit on the PMF frame provided to the CI. FRITZ advised the CI that GRANAT only printed one PMF frame and instructed the CI to remove the remaining polymer filament on the PMF frame. FRITZ then advised the CI, "we'll send you the link for the rails and shit" needed to finish the firearm. *Id.* ¶ 20 (emphasis added).[2]

- On February 20, 2025, investigators utilized the ATF CI to conduct another controlled purchase. . . . *FRITZ then provided the CI with a Glock-style PMF frame and stated, 'and then he (GRANAT) wants me to give you this lower too . . .'* FRITZ then removed the slide from his pistol and compared its frame to the PMF frame he had sold to the CI. FRITZ explained which internal components would need to be purchased in order for the frame to accept a slide while packaging the Glock-style MCDs in a plastic sandwich bag. *Id.* ¶ 21 (emphasis added).

- According to a case agent, FRITZ'[s] cell phone revealed messages indicating *GRANAT was going to split some of the proceeds from the sale* of MCDs and *PMFs with FRITZ*; however, additional details are unknown. *Id.* ¶ 29 (emphasis added).

Based on the evidence presented, Mr. Granat was manufacturing the firearm frames for distribution, not to retain for personal use. Accordingly, his characterization of the firearms as

---

[1] Mr. Granat raises a limited objection to Paragraphs 18, 19, 21, 24, 27, and 38 of the PSR and Page R-5 of the Sentencing Recommendation, challenging the classification of numerous devices designed to convert firearms into machineguns as "firearms" or "MCDs." I will address this issue hereafter. Mr. Granat does not, however, dispute that he sold two Glock 19-style PMFs to the CI.

[2] Mr. Granat makes a limited objection to Paragraph 20 of the PSR, contending that the PMF frames do not qualify as firearms as they are incomplete because they did not have rails attached. He admits that while Mr. Fritz did advise the confidential informant that they would send him the necessary links to finish the firearm, neither of them followed up with the CI regarding the rails nor sent him any additional information. This issue is addressed below. But, again, Mr. Granat does not dispute that he sold a Glock-style PMF to the CI.

intended solely for personal use is inconsistent with facts. Federal law prohibits engaging in the business of manufacturing firearms for sale or distribution without a license. *United States v. Vlha*, 142 F.4th 1194, 1199 (9th Cir. 2025); 18 U.S.C. § 922(a)(1)(A).[3] Thus, these firearm frames fall within the scope of U.S.S.G. § 2K2.1(b)(1)(B).

Second, Mr. Granat contends that the four-level enhancement under U.S.S.G. § 2K2.1(b)(1)(B) should not apply because the only firearm that qualifies is the completed and functioning firearm possessed by Mr. Fritz at the time of arrest and that the possession of a single firearm is not enough to trigger the enhancement.[4] Def.'s Obj. to PSR at 3. He claims the seven frames relied upon by the prosecution are not firearms because they are too incomplete. *Id.*

> Under the Gun Control Act ("GCA"), a firearm is defined as
>
> (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3).

The U.S. Supreme Court has previously held that the GCA allows the ATF to regulate, "at least some 'partially complete' frames or receivers." *Bondi v. VanDerStok*, 604 U.S. 458, 478 (2025). At the same time, the Court emphasized that the GCA does not extend to "any combination of parts susceptible of conversion into a frame or receiver with sufficient time, tools, and expertise." *Id.* at 481. It explained that "[l]ike the term 'weapon,' the artifact nouns

---

[3] "It shall be unlawful—(1) for any person—(A) except a . . . licensed manufacturer . . . to engage in the business of . . . manufacturing . . . firearms." 18 U.S.C. § 922(a).

[4] Because both parties agree, I will accept as true that the firearm possessed by Mr. Fritz upon his capture is a "firearm" for the purposes of U.S.G.G. § 2K2.1(b)(1)(B).

'frame' and 'receiver' have their bounds. Some products may be so far from a finished frame or receiver that they cannot fairly be described using those terms." *Id.*

While the Supreme Court did not establish a bright-line test, it provided an example illustrating when a partially complete frame can qualify as a firearm. The Court noted that a frame requiring only the removal of plastic tabs and the drilling of a few pin holes was sufficient to be considered a firearm under the GCA. The Court suggested that an ordinary person would recognize such a product as a firearm frame, and it rhetorically added, "Just look again at the second photo. What else would you call it?" *Id.* at 478.

Applying the Supreme Court's guidance in *Bondi v. VanDerStok* to the present case, the frames possessed by Mr. Granat, numbered Exhibits 13, 51, 114, 119, 120, 121, and 122 by the ATF, qualify as firearms under § U.S.G.G. 2K2.1(b)(1)(B).


*Exhibits 13, 51, 114, 119, and 120*

In the ATF Report submitted by the prosecution, ATF Special Agent W. Griffon Lifrod analyzed frames marked as exhibits 13, 51, 114, 119, and 120. Lifrod Report at 1, ECF No. 89-1. After examination, he determined that each frame incorporated key characteristics of a completed Glock-type pistol frame, including the trigger mechanism cavity, locking block cavity, slide lock cavity, trigger pin hole, trigger housing pin hole, trigger cutout, magazine catch cavity, and magazine well. *Id.* at 8-11. Based on these features, Agent Lifrod concluded that each of these were designed to expel a projectile by the action of an explosive. *Id.* Furthermore, as can be seen from the photos, the frames resemble firearms.

Mr. Granat argues that the frames are not firearms because they are incomplete. Def.'s Obj. to PSR at 3-5. He asserts that they "could not be readily assembled into a firearm with

additional parts" and were only partially machined, requiring further fabrication. *Id*. However, he does not specify what additional parts or fabrication steps would be needed. This renders his argument unpersuasive.

*Exhibits 121 and 122*

Similarly, Agent Lifrod examined Frames marked as exhibits 121 and 122 and concluded that they shared the key characteristics of a completed Glock-type pistol frame. Lifrod Report at 11-12. While somewhat more crude due to the presence of excess material, these frames still resemble a firearm. More importantly, Agent Lifrod's assessment shows they are functionally similar to Frames marked as exhibits 13, 51, 114, 119, and 120, as they retain the same internal features. *Id*. He concluded that they too are "designed to expel a projectile by the action of an explosive." *Id.*

As these frames were "designed to… expel a projectile by the action of an explosive," they constitute firearms under U.S.G.G. § 2K2.1(b)(1)(B). Consequently, Mr. Granat's objection to application of this four-level increase in his offense level is OVERRULED.

**Exhibit 13**
Comparison to NFC Glock 23 frame

25-04563
2025-494-TEB
Page 4 of 164

  

*Id.* at 32.

**Exhibit 51**
Comparison to NFC Glock 43X Frame
NFC Glock 43X Frame (on bottom)

25-04563
2025-494-TEB
Page 8 of 164

 

*Id.* at 36.

**Exhibit 114**
Comparison to NFC Glock 22 Frame

25-04563
2025-494-TEB
Page 12 of 164

  

*Id.* at 40.

**Exhibit 119**
Comparison to NFC Glock 23 Frame

25-04563
2025-494-TEB
Page 16 of 164

  

*Id.* at 44.

**Exhibit 120**
Comparison to NFC Glock 23 Frame

25-04563
2025-494-TEB
Page 20 of 164





*Id.* at 48.

**Exhibit 121**
Comparison to NFC Glock 22 frame

25-04563
2025-494-TEB
Page 23 of 164





*Id*. at 51.

**Exhibit 122**
Comparison to NFC Glock 22 frame

25-0463
2025-494-TEB
Page 26 of 164

  

*Id.* at 54.

<u>Objection to Paragraph 40 of the PSR (the Offense Level Calculation)</u>

Mr. Granat additionally objects to the PSR's application of a four-level increase under

U.S.S.G. § 2K2.1(b)(4)(B)(ii). That enhancement applies if:

> (B)(i) any firearm had a serial number that was modified such that the original information is rendered illegible or unrecognizable to the unaided eye; or (ii) the defendant knew that any firearm involved in the offense was not otherwise marked with a serial number . . . or was willfully blind to or consciously avoided knowledge of such fact . . . .

U.S.S.G. § 2K2.1(b)(4)(B)(ii).

In objecting to the application of this provision, Mr. Granat raises the same arguments he

did for the U.S.S.G. § 2K2.1(b)(1)(B) enhancement. He contends that it was not unlawful for

him to possess 3D-printed frames for personal use and that federal law does not require serial numbers on privately manufactured firearms for personal use. He also asserts that none of the frames qualifies as a firearm, and therefore, the frames cannot trigger the four-level increase in U.S.S.G. § 2K2.1(b)(4)(B)(ii).

Both arguments raised by Mr. Granat fail. First, as discussed in the section above, the Glock-type frames Mr. Granat manufactured qualify as firearms. Therefore, the requirements of U.S.S.G. § 2K2.1(b)(4)(B)(ii) are applicable.

Second, Mr. Granat and Mr. Fritz sold the frames to the confidential informant. Again, these frames were not made for personal use, but rather for distribution. None bore a serial number. Mr. Granat knew they lacked serial numbers because he manufactured the frames himself. Under the Guidelines, the enhancement applies whenever "any firearm" involved in the offense meets this criterion. Here, Mr. Granat sold at least two without serial numbers to the CI. Accordingly, the four-level enhancement under U.S.G.G. § 2K2.1(b)(4)(B)(ii) is appropriate, and Mr. Granat's objection is OVERRULED.


**Additional Objections and Clarifications That Do Not Impact the Guideline Range**

Objection to Paragraph 16 of the PSR

Mr. Granat objects to the PSR's characterization of "two suspected black polymer pistol frames" in a photograph as firearms, arguing that the items were incomplete and did not meet the statutory definition of a firearm. Def.'s Obj. to PSR at 6. In response, the prosecution argues that the two suspected black polymer pistol frames were firearms and asserts that Mr. Granat failed to present evidence demonstrating that they differed from the other frames recovered in this case. Resp. to Def.'s Obj. to PSR at 9-10.

The prosecution's argument improperly shifts the burden of proof to Mr. Granat. Once a defendant objects to a factual assertion in the PSR, the burden rests with the prosecution to prove that fact by a preponderance of the evidence. *See United States v. Shinault*, 147 F.3d 1266, 1277-78 (10th Cir. 1998) ("When a defendant objects to a fact in a presentence report, the government must prove that fact at a sentencing hearing by a preponderance of the evidence."). The burden does not shift to the defendant to disprove the contested fact.

Here, the prosecution has not presented evidence sufficient to establish that the two black polymer pistol frames meet the statutory definition of a firearm. Mere conjecture or reliance on similarity to other items is insufficient to satisfy its evidentiary burden. Accordingly, Mr. Granat's objection is SUSTAINED.

Objection to Paragraphs 18, 19, 21, 24, 27, and 38 of the PSR and Page R-5 of the Sentencing Recommendation

Mr. Granat objects to the characterization of all devices recovered as machinegun conversion devices, arguing that the Government cannot establish that the devices were functional. He contends that, because the devices allegedly did not operate as intended, they cannot qualify as machineguns under the National Firearms Act ("NFA"), 26 U.S.C. § 5845(a)(6) and (b). Mr. Granat admits that some of the devices recovered were functional and may be machineguns under the NFA. *See* Def.'s Obj. to PSR at 6.

Section 5845(b) defines a "machinegun" to include:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

13

26 U.S.C. § 5845(b). The statute expressly includes within the definition of "machinegun" any part "designed and intended solely and exclusively" for use in converting a weapon into a machinegun. Nothing in the statutory text requires that such a conversion device be functional at the time of recovery.

Here, Mr. Granat does not dispute that he designed the MCDs for the purpose of converting firearms into machineguns. His objection rests solely on the contention that the devices did not function. Because functionality is not a statutory requirement under § 5845(b), his argument is unpersuasive.

Mr. Granat also presents an expert report by Richard Vasquez. I find Mr. Vasquez's opinion unpersuasive, as it is speculative. He concludes that the material is flimsy based solely on photographs, without providing any explanation for how he reached that conclusion or conducting a direct examination of the exhibits themselves.

Accordingly, Mr. Granat's objection is OVERRULED.

Objection to Paragraph 20 of the PSR

Mr. Granat reasserts his objection that the PMF frames provided to the CI on February 19 were not firearms because they were incomplete. Def.'s Obj. to PSR at 20. Specifically, they did not have rails attached. *Id.*

To the extent the PMF frames given to the CI are identified in the ATF Report as Exhibits 13, 51, 114, 119, 120, 121, or 122, the objection is OVERRULED. The prosecution has provided evidentiary support that is sufficient to establish, by a preponderance of the evidence, that those items meet the applicable definition.

Objection to Paragraph 30 of the PSR

Paragraph 30 of the PSR recounts that a proffer interview was conducted with Mr. Fritz and summarizes information obtained during that interview. Mr. Granat objects to and requests that I strike that information in the Def.'s Obj. to PSR at 8-9. He asserts that neither he nor his counsel were aware of Mr. Fritz's proffer interview with the government until July 9, 2025, when they received a draft of the PSR. *Id.* He claims that he has not been provided with a report or any details regarding the proffer interview and argues the allegations are prejudicial because he was unable to adequately investigate and confront them. *Id.*

The prosecution has not responded to Mr. Granat's objection. Given that the prosecution has failed to address the objection, and in light of Mr. Granat's lack of access to the necessary information to investigate Mr. Fritz's statements, ¶ 30 is stricken, and Mr. Granat's objection is SUSTAINED.

Objection to Page R-5 of the Sentencing Recommendation

Mr. Granat objects to the Probation Officer's use of Mr. Fritz's statement that they were making "the most illegal guns you can make" show Mr. Granat's intent. *Id.* While I accept as fact that Mr. Fritz made this statement, it is not permissible to attribute it to Mr. Granat, and thus, I will not do so.

Clarification to Paragraph 16, 20, and 68 of the PSR

Along with his objections, Mr. Granat provided clarifications to information in Paragraphs 16, 20, and 68 of the PSR, and the Probation Officer incorporated those clarifications.

<u>Objection to Special Conditions 6 through 10</u>

Mr. Granat objected to five of the special conditions of supervision initially recommended by the Probation Officer. In the updated Sentencing Recommendation, the Probation Officer has eliminated those conditions.

Apart from the objections discussed above, the prosecution and Mr. Granat do not object to any other aspect of the PSR. Therefore, I adopt the unchallenged factual statements as my findings of fact for this sentencing.

## II.  MR. GRANAT'S MOTION FOR VARIANT SENTENCE OF PROBATION (ECF NO. 83)

I have already informed the parties that I do not intend to follow the Sentencing Guidelines for Mr. Granat's sentence. This is because the Guidelines do not adequately take into account Mr. Granat's unique circumstances, which I discuss below. In summary, Mr. Granat urgently needs both mental health and substance abuse treatment and, due to his military service, quality treatment options are available to him through the VA. Mr. Granat has been on pretrial release for over a year, and in that time, he has held steady employment and enrolled at a technical college. Mr. Granat has strong family and community ties and will both need to be supported and will need to provide support in those relationships in the coming years. Moreover, the relevant Guidelines provisions have been recently amended, suggesting that the provisions in the 2024 Guidelines that I must apply in this case did not adequately assess the criminal conduct. These circumstances warrant the rejection of the Guidelines in this case.

Given this conclusion, I determine the appropriate sentence for Mr. Granat based on an

exhaustive review of the record and the factors set out in 18 U.S.C. § 3553(a). I will provide my

full ruling on Mr. Granat's Motion in imposing his sentence.

### III.  ACCEPTANCE OF RESPONSIBILITY

Although I am not applying the Sentencing Guidelines in this case, I still must ensure that

the range is accurately calculated. As I have already discussed, the Guidelines calculation in the

PSR decrease the offense level by three based on Mr. Granat's acceptance of responsibility.

Generally, I have applied the reductions available under U.S.S.G. § 3E1.1(a) and (b) liberally,

whenever a defendant expressed true remorse. I have refused to apply the provisions as a tax on

individuals who exercised their right to trial. The commentary to the Guidelines lists

"appropriate considerations" for determining whether a defendant qualifies for the acceptance-

of-responsibility reductions, including, as relevant here, whether the defendant: admitted the

conduct of the offense of conviction and all other relevant conduct; voluntarily terminated the

criminal activity or withdrew from it or criminal associations; voluntarily and promptly

surrendered to the authorities; "voluntarily assisted the authorities in the recovery of the fruits

and instrumentalities of the offense"; engaged in post-offense rehabilitative efforts; and quickly

manifested the acceptance of responsibility. U.S.S.G. § 3E1.1, commentary n.1. Mr. Granat did

not voluntarily terminate his criminal conduct, has not admitted all relevant conduct here, and

has not ensured that the fruits and instrumentalities of his offense have been recovered. However,

the remorse has been genuine and complete, and it is clear he has accepted responsibility for his

actions. The prosecution has orally moved for the additional one-level decrease of the offense

level under U.S.S.G. § 3E1.1(b), and I have granted that motion. Therefore, I find the Sentencing Guidelines calculation as stated in the PSR is accurate.

## IV.  ANALYSIS OF THE § 3553(a) FACTORS

Section 3553(a) requires me to impose a sentence that is "sufficient, but not greater than necessary" to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public, and to provide the defendant with training, care, or treatment in the most effective manner. The statute further demands consideration of the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable Sentencing Guidelines, and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a).

**Nature and Circumstances of the Offense**

Mr. Granat has pleaded guilty to conspiracy to violate the laws of the United States, namely by possessing a machinegun in violation of 18 U.S.C. §§ 922(o) and 924(a)(2) and making an unregistered machinegun in violation of 26 U.S.C. § 5861(f).

In this case, Mr. Granat acquired a 3D printer, obtained instructions for printing privately made firearms and machinegun conversion devices, printed hundreds of those items, and then sold them. It is obvious that selling these types of devices without any regulation or traceability is incredibly dangerous. The full details of Defendants' completed sales are unknown, but Mr. Fritz bragged that they sold an MCD to a 16-year-old. *See id.* ¶ 13. As I have already found and is set out in the PSR, Mr. Granat's crime involved at least 8 firearms and 417 machinegun

conversion devices. *See* PSR ¶¶ 27-28. The extent of the destruction and danger that these devices could cause is truly unfathomable.

Particularly relevant here because of where Mr. Granat presently lives, the U.S. Attorney's Office for the Western District of Wisconsin issued a press release in December 2024 explaining that machinegun conversion devices "are an emerging threat, and law enforcement agents are increasingly finding them in Wisconsin." *U.S. Attorney's Office And ATF Highlight Emerging Threat Posed by Machinegun Conversion Devices*, U.S. Attorney's Office, Western Dist. of Wisc. (Dec. 2, 2024), available at https://www.justice.gov/usao-wdwi/pr/us-attorneys-office-and-atf-highlight-emerging-threat-posed-machinegun-conversion. The press release notes that "[d]ischarging a weapon equipped with such a device in a public area endangers every child and adult within range." *Id.* Such discharges are occurring with increased frequency, as law enforcement officers are finding staggering numbers of shell casings at homes, restaurants, street corners, and other public places that have become shocking crime scenes. *See, e.g.*, Bill Hutchinson & Jennifer Vilcarino, *Machine-gun conversion device dubbed 'Glock switches' taking violence to the 'next level': Experts*, ABC News (June 12, 2024), https://abcnews.com/US/machine-gun-conversion-device-taking-violence-level-experts/story?id=110855649 (accessed Feb. 24, 2026) (citing a 2023 ATF Report that 5,454 guns with machinegun conversion devices were taken into ATF custody from 2017 to 2021). This is absolutely not a case in which two teenagers were simply stealing hubcaps. This is a serious crime.

I question whether Mr. Granat would have stopped his criminal activity and how much farther he would have gone if law enforcement had not thwarted his plans. As the prosecution highlights, Mr. Granat admits that he engaged in the relevant criminal conduct in this case for nearly a year. Mot. for Variant Sentence at 8, ECF No. 83 ("This conduct only lasted for a period

of less than a year [until] his arrest in March 2025."). There is no indication that he was hesitant or second guessed his actions during that period. Instead, he was working on perfecting his products and figuring out how to manufacture other similar ones.

Mr. Granat claims his "actions were driven not by any intent to arm others or profit from illegal weapons trafficking, but rather by an immature and misguided fixation on his 3D printer and the technical challenges to manufacture these devices." Mot. for Variant Sentence at 7. He explains that, after obtaining the 3D printer, "his focus quickly switched to firearms when he discovered a prevalent online community normalizing and glorifying 3D-printed gun construction." *Id.* According to Mr. Granat, "[t]his pervasive online existence allowed [him] to separate himself from the reality of what he was printing and lose sight of the dangerous and illegal nature of what he was doing." *Id.* at 7-8. Today, during his allocution, Mr. Granat stated: "I thought it was cool, and it gave me something to feel important about." I believe this is a true statement.

This explanation, however, does not instill confidence that he could not again be influenced or swept up such that he becomes a danger to the public. Undoubtedly, Mr. Granat is smart and hardworking, but it is less certain whether he will grasp all the potential consequences of his actions going forward.[5]

---

[5] The PSR notes that Mr. Granat's account statements show he spent $4,833.27 over 38 purchases at Puff Paradise Smoke Shop in Wadsworth, Illinois, between August 24 and November 28, 2025. PSR ¶ 100. As the PSR recognizes, these purchases are alarming because they indicate Mr. Granat likely violated the conditions of his pretrial release by leaving the Eastern District of Wisconsin without authorization. Puff Paradise is located approximately 30 miles and across the state border from his residence in Wisconsin. At the sentencing hearing, Mr. Granat's counsel explained that Mr. Granat was buying kratom, a substance to which he has been addicted and that is regulated in Wisconsin. Consumption of kratom produces stimulant effects in low doses and sedative effects in high dose and can lead to psychological and physiological dependence. *See* Drug Fact Sheet: Kratom, Dep't of Justice (Apr. 2020), https://www.dea.gov/sites/default/files/2020-06/Kratom-2020_0.pdf. This conduct mere months

**History and Characteristics of the Defendant**

By all accounts, Mr. Granat was a bright and caring child with lots of promise, but he has faced numerous difficulties in his life. His family struggled financially, and his parents divorced when he was a year old. During his elementary and middle school years, he experienced some instability—he attended multiple schools, his mother moved out of state for a brief time, and he had to adjust to changing circumstances with his parents and their partners over the years. Mr. Granat was a good student, but he experienced pervasive bullying that negatively impacted him.

While Mr. Granat was in high school, he suffered a significant loss when his older brother was convicted of a felony and sentenced to four years and nine months in prison. Mr. Granat and his brother were very close, and the sudden absence of his brother and the consequences for Mr. Granat made his high school years emotionally and socially challenging. Mr. Granat's grades declined, and he began experimenting with alcohol and drugs. In his junior year of high school, the COVID-19 pandemic required him to again adjust to circumstances beyond his control and to finish the school year virtually.

Mr. Granat then set his sights on joining the military. He graduated from high school early and enlisted in the Army in late 2020, at the age of 17. He elected to become a Combat Medic. After completing basic training, he received specialized training to "administer emergency medical care in the field in both combat and humanitarian situations." Military Mitigation Memo. at 5, ECF No. 83-2 (citation omitted). Mr. Granat was called on to provide emergency medical care to his fellow soldiers during his service, including during a training exercise in which a soldier was seriously injured. *See* Mitigation Report at 10.

---

ago indicates Mr. Granat may continue to struggle with understanding the consequences of his actions, whether it is because of substance dependency or some other reason.

Mr. Granat began dating another servicemember in 2021, and the couple married later that year. Although it is reported that Mr. Granat was happy during the first year of his marriage, the record suggests he may have been struggling with his mental health and substance use in late 2021,[6] and that his substance abuse worsened as his marriage unraveled. In February 2023, Mr. Granat learned that his wife had been having an affair with her commanding officer. Mr. Granat's mental health deteriorated, and he was admitted to an inpatient behavioral health treatment program for six days. Later that year, he was deployed to South Korea. In January 2024, while he and his wife were both stationed in South Korea, his wife filed for divorce. He was only 20 years old. Shortly thereafter, while Mr. Granat was still in South Korea, his younger brother, for whom he has been a role model and a caregiver, was diagnosed with a terminal genetic condition. This series of hardships culminated in January 2024 with Mr. Granat stealing etomidate, "a hypnotic agent typically administered before an anesthetic or sedative in a surgical context," and self-administering it. Mitigation Report at 12 n.19. Afterward, Mr. Granat was hospitalized for five days.

As a result of this incident, Mr. Granat faced discharge from the Army. He fought to be able to continue his service. A number of his fellow soldiers wrote letters in support of his retention, including his uncle, Staff Sergeant Anthony Houts. In Staff Sergeant Houts's letter, he stated: "I would stake my career on [Mr. Granat] surpassing all expectations set on him." Army Retainability Memorandum, ECF No. 83-4 at 8. Despite his efforts, on June 14, 2024, Mr. Granat was discharged from the Army under honorable conditions.

---

[6] The Mitigation Report submitted by Mr. Granat includes an account of a traumatic experience in which he was unconscious from alcohol use in October 2021. *See* Mitigation Report at 10. This traumatic experience is not discussed elsewhere but can be assumed to have darkened Mr. Granat's military service and impacted his mental health.

Now, Mr. Granat faces the consequences of these criminal proceedings for his dangerous and thoughtless actions. While he is under the sentence of this Court, he will be greatly restricted in what he can do. And, even after he has completed his sentence, he will have to live with the legal and social limitations for convicted felons. Although he may still be able to fulfill his goal of becoming a healthcare worker, that path will be much more difficult for him.

It should be emphasized that Mr. Granat's life has not been only a series of struggles and disappointments. He has notable accomplishments and a strong community of family and friends. One factor that sets Mr. Granat's circumstances apart is his service to our country. He joined the military at a very young age and was honored to serve. He learned quickly and excelled, despite the challenges that ultimately led to his discharge.

Additionally, Mr. Granat has the benefit of tremendous support from his family, friends, and coworkers, which is not often the case for defendants in criminal cases. The Mitigation Report submitted by Mr. Granat indicates that his family "will be there to support him no matter what form [his] new life course takes." Mitigation Report at 23. A theme from the many letters that were submitted in support of Mr. Granat is that he will be a productive member of society and is not a danger to the public. *See* Zasada Letter at 1, ECF No. 83-6 (referencing Mr. Granat's "commitment to becoming a positive, contributing member of society"); Garey Letter at 2, ECF No. 83-8 ("I firmly believe he has the capacity to contribute meaningfully to society and to continue to be a source of good for those around him."); Castillo Letter at 1, ECF No. 83-10 ("I do believe Christian will be a productive member of society."); Pogorelec Letter at 1, ECF No. 83-12 ("Christian is not a threat to society nor is he likely to commit another criminal act."). However, the person described in the letters seems incongruous with a person who would so cavalierly and committedly break the law and join in putting a machinegun in the hands of a 16-

year-old. *See, e.g.*, Garey Letter at 1 (describing Christian as having "a strong moral compass" and "a heart for helping and protecting those who are marginalized, mistreated, or preyed upon").

Mr. Granat has struggled with his mental health and substance abuse throughout his life. As the Mitigation Report states, "it is well documented that [Mr. Granat] has turned to alcohol and other substances as coping mechanisms in the past." *See, e.g.*, Mitigation Report at 19. There are also reports that Mr. Granat has engaged in self-harm behaviors and suffered from suicidal ideation at times. *See, e.g.*, *id.* at 8, 11; PSR ¶¶ 70-72, 77. Mr. Granat "will need to address his mental health, potential PTSD symptomology, and any connected negative coping mechanisms like substance use." Mitigation Report at 20. Perhaps because of his family support or because of his own awareness, Mr. Granat has been able to reach out for help with his mental health struggles in the past. This willingness makes it more likely that he will take advantage of the opportunities provided to him and will work to improve his mental health and functioning in society.

**Kinds of Sentences Available**

Mr. Granat's need for treatment but also the uncertainty in his ability to appreciate the consequences of his actions are key considerations in evaluating the kinds of sentences that are available. As previously explained, the maximum term of imprisonment for Mr. Granat's crime of conviction is five years. With a prison sentence, a term of supervised release of zero to three years may be imposed. Instead of imprisonment, Mr. Granat may be given a sentence of one to five years of probation. The Probation Officer recommends a sentence of 24 months' imprisonment, 2 years of supervised release, and a fine of $2,000. The Government advocates for

a sentence of 36 months in prison followed by 3 years of supervised release. And Mr. Granat requests a variant sentence of a term of probation.

**Sentencing Disparities**

In an effort to show that imposing a term of probation in this case would not create sentencing disparities, Mr. Granat submits that a criminal cases report spanning January 1, 2020, to February 3, 2026, (and presumably limited to the District of Colorado) returned only six cases in which a defendant had been charged under 18 U.S.C. § 922(o) and none of the defendants in those cases has been sentenced. Mot. for Variant Sentence at 16. Mr. Granat also ran a criminal cases report for defendants charged with violating 18 U.S.C. § 5861(f), which showed only one case over the past fifteen years and the defendant in that case is awaiting sentencing. *Id.* My search for relevant cases was much more fruitful, as I did not limit the parameters to such a narrow timeframe or geographical range. No defendant in the cases I uncovered received a sentence of probation nor has Mr. Granat drawn my attention to such a case. The following cases provide a few examples:

- *United States v. Bishop*, 926 F.3d 621 (10th Cir. 2019) (noting that the defendant had been sentenced to 33 months' imprisonment, followed by 36 months' supervised release for violations of 18 U.S.C. § 922(o) and 26 U.S.C. § 5861(a));

- *United States v. Haney*, 264 F.3d 1161 (10th Cir. 2001) (at a time in which the Sentencing Guidelines were mandatory, noting the defendant had been sentenced to 33 months for possession of two machineguns in violation of 18 U.S.C. § 922(o)); and

- *United States v. Cordero-Velázquez*, 124 F.4th 44 (1st Cir. 2024) (affirming a 48-month sentence for violation of 18 U.S.C. §§ 922(o) and 924(a)(2), despite a Guidelines range of 30-37 months).

In fact, in the sole case I uncovered where probation was imposed for a violation of 18 U.S.C. § 922(o), the Tenth Circuit reversed the sentence. *See United States v. Hildreth*, 485 F.3d 1120, 1130 (10th Cir. 2007). In *Hildreth*, the defendant had purchased one machinegun and purchased and sold another firearm he believed might be a machinegun. *Id.* at 1126. The district court sentenced the defendant to three years of probation, which the Tenth Circuit found to be unreasonable, because the district court "essentially ignored" the recommended Guidelines range of 27 to 33 months' imprisonment. *Id.* at 1129. In reaching its holding, the Tenth Circuit relied on a case that has since been reversed, but the court's analysis is still instructive. *Id.* at 1126 (citing *United States v. Cage*, 451 F.3d 585, 594 (10th Cir. 2006)). The Tenth Circuit criticized the district court's conclusions "because [its] reasons [did] not distinguish [the defendant] or his offense from the ordinary defendant upon which the Guidelines sentence is calculated." *Id.* at 1129. Here, I have considered the advisory Guidelines range and have articulated reasons that distinguish Mr. Granat's circumstances and justify rejecting the Guidelines.

**Furthering the Purposes of Sentencing**

The purposes of sentencing I find to be most relevant in this case are the need to promote respect for the law, to protect the public, to deter Mr. Granat from committing any other crimes, and to provide him with critical treatment. Law enforcement in this case spent significant time and resources to stop Mr. Granat's criminal conduct. Those efforts were necessary because Mr. Granat was blatantly breaking laws meant to keep our communities safe. Lord Denning, one of

the most remarkable legal minds of the twentieth century, who served as Master of the Rolls of the Court of Appeal in England, explained that:

> Punishment is the way in which society expresses its denunciation of wrong doing: and, in order to maintain respect for law, it is essential that the punishment inflicted for grave crimes should adequately reflect the revulsion felt by the great majority of citizens for them. It is a mistake to consider the objects of punishment as being deterrent or reformative or preventive and nothing else . . . . The truth is that some crimes are so outrageous that society insists on adequate punishment, because the wrong-doer deserves it, irrespective of whether it is a deterrent or not.

Royal Commission on Capital Punishment, Minutes of Evidence, Dec. 1, 1949, p. 207 (1950) (quoted in *Gregg v. Georgia*, 428 U.S. 158, 184 n.30 (1976)). I find that respect for the law, in this case, demands a sentence of imprisonment.

Despite the confident assertions by Mr. Granat and his counsel that he has been specifically deterred from any further criminal activity, I am not certain. As I have expressed, his actions leave doubt as to whether he will fully understand the consequences of his actions and conform his conduct to the requirements of this Court and the law going forward.

Mr. Granat needs extensive mental health and substance abuse treatment. I acknowledge that Mr. Granat, because of his status as a veteran, would likely receive better care in the community. *See* Mitigation Report at 20 ("It is unlikely that Christian would be able to access a comparable level of care while in the Bureau of Prisons."). His Mitigation Report and Motion for Variant Sentence contain persuasive information on the alarming shortage of psychologists in federal prisons. *See id.*; Mot. for Variant Sentence at 12 (citing publications from The Marshall Project as well as a Nevada Law Journal article). Nevertheless, the other sentencing considerations outweigh this lamentable circumstance. The BOP does have established programs for substance abuse and mental health treatment, and Mr. Granat will be able to take advantage of the care provide by the Department of Veterans Affairs upon his release.

## V.  IMPOSITION OF THE SENTENCE

Researchers and scholars are documenting and paying more attention to the challenges of young men in our society today, looking at educational outcomes, mental health, substance abuse, incarceration, and other trends. I think it is important for Mr. Granat to know that he is not alone in his struggles. People see the difficulties young men like Mr. Granat are facing, and they care. I care. While his actions have consequences and he must be held accountable, he as a person is not a failure; he still has the potential to contribute to society and even serve our country, though it may be different than he originally envisioned. He will be required to engage in extensive mental health treatment. This is an opportunity for him to learn and explore how his individual brain works, to recognize its limitations and needs as well as its exceptional abilities.

The materials filed by Mr. Granat note how difficult it can be to readjust to civilian life and the isolation veterans often feel. I encourage Mr. Granat to continue to look for community, not online, not in the fringes of the internet, but in person, perhaps with other veterans. The letters his friends and family submitted on his behalf indicate that he wants to be of service to the community and, in particular, that he wants to provide support to marginalized groups. There is a role for him—with his unique perspective—working within the system to make it better for people who have faced some of the same challenges he has, including for children who are bullied, trauma survivors, veterans, and individuals struggling with their mental health. Mr. Granat may still be able to fulfill his aspiration of becoming a healthcare worker, but another law violation could close that door. He is at a crossroads, and the choices he makes won't just shape his future, they will continue to impact the lives of those around him.

Accordingly, pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that Mr. Granat is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 24 months. I make the recommendation to the Bureau of Prisons that Mr. Granat be placed as near as possible to his family in Wisconsin and that he be placed at a facility where substance abuse and mental health treatment will be available to him. The Motion for Variant Sentence of Probation (ECF No. 83) is, therefore, GRANTED IN PART.

Upon release from imprisonment, he shall be placed on supervised release for a term of three years. I find this term length is appropriate based on an individualized assessment of the factors set forth at 18 U.S.C. §§ 3553(a) and 3583(a)-(c). The term imposed considers the nature and circumstances of the offense and Mr. Granat's history and characteristics. Further, the term is sufficient, but not greater than necessary, to address the purpose of imposing supervised release. Within 72 hours of release from the custody of the Bureau of Prisons, Mr. Granat shall report in person to the Probation Office in the district where he is released.

**Special Assessment and Fine**

Mr. Granat shall pay a special assessment of $100. The special assessment obligation is due and payable immediately, by lump sum. While I am not convinced that benefiting financially was the goal of Mr. Granat's criminal activity in this case, I agree with the Probation Officer that the imposition of a fine is necessary to reflect the seriousness of the offense and because he did in fact make money from the devices he manufactured and negotiated the prices for those devices. Considering his financial circumstances, present earning capacity, need for medical treatment, and family circumstances, however, I find a fine of $1,600 is appropriate and sufficient.

**Conditions of Supervision**

While on supervision, Mr. Granat must not commit another federal, state, or local crime, and must not unlawfully possess a controlled substance.

He must refrain from any unlawful use of a controlled substance. He must submit to one drug test within 15 days of release from imprisonment and a maximum of 20 tests per year of supervision thereafter.

He must cooperate in the collection of DNA as directed by the Probation Officer.

He must comply with the standard conditions adopted by this Court in General Order 2020-20.

**Special Conditions**

I find additional special conditions of supervision are appropriate based on the nature of the crime, Mr. Granat's clear history of substance abuse, and his mental health history. Specifically, the condition for substance abuse treatment is necessary based on his history of substance abuse, including his alcohol abuse and self-administration of etomidate. The condition for mental health treatment is similarly necessary due to his present mental health diagnoses and his exposure to stress and trauma. Lastly, a search condition is necessary because Mr. Granat's crime involved the production of dangerous and illegal weapons. The safety of the public and the Probation Officer and his well-being demand that such a condition be imposed. The Mitigation Report from the Public Defender's Office suggests that Mr. Granat's mental health conditions may have been exacerbated by the execution of the warrant in this case. I am sensitive to the fact that the search condition could trigger similar symptoms. But I emphasize that a search may only be conducted when reasonable suspicion exists that Mr. Granat has violated a condition of his

30

supervision and any search must be conducted at a reasonable time and in a reasonable manner. I expect that Mr. Granat will maintain an excellent relationship with his supervising Probation Officer and that his actions will leave him confident that he is in full compliance with the terms of his supervision.

Accordingly, I find that the following special conditions of supervision are determined to be reasonably related to the factors enumerated in 18 U.S.C. § 3553(a) and 18 U.S.C. § 3583(d). And I find, based on the nature and circumstances of the offense and Mr. Granat's history and characteristics, the following conditions do not constitute a greater deprivation of liberty than reasonably necessary to accomplish the goals of sentencing.

1. Mr. Granat must participate in a program of testing and/or treatment for substance abuse approved by the Probation Officer and follow the rules and regulations of such program. The Probation Officer, in consultation with the treatment provider, will supervise Mr. Granat's participation in the program as to modality, duration, and intensity. He must abstain from the use of alcohol or other intoxicants during the course of treatment. He must not attempt to obstruct, tamper with or circumvent the testing methods. He must pay for the cost of testing and/or treatment based on his ability to pay.

2. Mr. Granat must participate in a program of mental health treatment approved by the Probation Officer and follow the rules and regulations of such program. The Probation Officer, in consultation with the treatment provider, will supervise Mr. Granat's participation in the program as to modality, duration, and intensity. He must pay for the cost of treatment based on his ability to pay.

3. In any program of treatment on supervised release, any requirement to submit to polygraph testing or eye-movement or reaction examination may not be used unless the

Probation Officer files a report, and an evidentiary hearing will be held to determine if such testing is appropriate and competently administered. A written order authorizing the testing must be received from an Article III judge of this Court.

4. Mr. Granat must submit his person, property, house, residence, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), other electronic communications or data storage devices or media, or office, to a search conducted by a United States Probation Officer. Failure to submit to search may be grounds for revocation of release. Mr. Granat must warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that Mr. Granat has violated a condition of his supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

5. Mr. Granat must pay the fine imposed in accordance with the Schedule of Payments sheet of the Judgment. He must also notify the court of any changes in economic circumstances that might affect his ability to pay the fine.[7]

DATED this 24th day of February, 2026.

_John L. Kane_
_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE

---

[7] The prosecution filed a Notice (ECF No. 95) regarding forfeiture on February 23, 2026, and advised that it is not seeking a criminal order of forfeiture for the items listed in the Indictment.